**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **INTEGRATED MEDIA RESOURCES, LLC,** Individually and Derivatively on Behalf of Nominal Defendant **G2 FMV, LLC** and also Double Derivatively on Behalf of Nominal Defendant **G2 INVESTMENT GROUP, LLC.** <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **JONATHAN TODD MORLEY, DORI V. KARJIAN, DAVID SAMS, JONATHAN LERMAN, ANTONIO DE LA RUA, MARIA BOYAZNY,** <br><br> **Defendants,** <br><br> **and** <br><br> **G2 FMV, LLC,** and **G2 INVESTMENT GROUP, LLC.** <br><br> **Nominal Defendants.** | § § § § § § § § § § § § § § § § § § § § § § § § § | **CIVIL CASE NO. ________________** |

## VERIFIED COMPLAINT

Plaintiff Integrated Media Resources, LLC, ("IMR") Derivatively on Behalf of G2 FMV, LLC, ("G2 FMV") and also Double Derivatively on Behalf of G2 INVESTMENT GROUP, LLC, ("G2 IG") upon information and belief except with respect to allegations made in connection with its ownership of G2 FMV common stock; and Individually, upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, allege as follows:

## I.

## NATURE OF THE ACTION

1. Plaintiff, a shareholder of G2 FMV, brings this derivative action on behalf of G2 FMV to redress injuries suffered by it and its investors as a result of defendants Jonathan Todd Morley ("Morley"), Dori V. Karjian ("Karjian"), David Sams ("Sams"), Jonathan Lerman ("Lerman"), Antonio de la Rua ("de la Rua"), and Maria Boyazny ("Boyazny") collectively, (the "Insider Defendants") all former managing members and/or executive officers of G2 FMV and its subsidiary, G2 IG, based on the Insider Defendants' fraudulent and/or grossly negligent misrepresentations, and knowing, reckless and/or grossly negligent breaches of fiduciary duties owed to G2 FMV and its investors. Plaintiff also asserts double derivative claims on behalf of G2 FMV against the Insider Defendants based on the claims of G2 IG, which at all relevant times, was operated under common control of the Insider Defendants.

2. The derivative claims in this action are brought for the benefit of Nominal Defendants G2 FMV and G2 IG, collectively (the "G2 Companies") against the Insider Defendants. Plaintiff seeks to recover derivatively on behalf of the G2 Companies for the Insider Defendants' violations of the law, including breaches of fiduciary duties, waste of corporate assets and unjust enrichment, relating to claims that have financially harmed the G2 Companies.

3. In addition, Plaintiff brings direct claims against defendants Morley and Karjian for fraudulent misrepresentation, and against defendants Morley, Karjian, Sams, Lerman, de la Rua, and Boyazny for civil conspiracy.

4. This action concerns a complex deception carried out by the corporate insiders of the G2 Companies to enrich themselves at the expense of their shareholders. From October 2013 to December 2020, (the "Relevant Period") the Insider Defendants concocted and executed a

scheme whereby the G2 Companies manipulated financial statements, artificially improved cash flow, generated bogus revenue numbers and hid debt, in order to provide a false sense of financial stability to sell millions of dollars in artificially inflated securities.

5. When the illusion began to crumble under the weight of their lies, the Insider Defendants began depleting all the assets belonging to the G2 Companies by siphoning its investors' funds through a series of insider transactions (each individually and collectively referred herein a "Transaction."). As the financial "house of cards" started collapsing, the Insider Defendants orchestrated and entered into multi-million-dollar loan agreements with entities they controlled on terms that were advantageous to those entities and grossly unfavorable to the G2 Companies. These loans are all non-performing or have been written off altogether.

6. The governing board of directors of G2 FMV and G2 IG were composed by its Management Committee and Executive Committee, respectively. The Management Committee of G2 FMV and the Executive Committee of G2 IG were controlled by Morley, de la Rua and Sams, who approved the series of transactions described below, giving rise to the claims herein. As a result of the the Insider Defendants' looting, the G2 Companies are now virtually worthless. G2 FMV and G2 IG are each presently insolvent, and both of their charters have been terminated by the Secretary of State of Delaware due to the Insider Defendants' failure to pay taxes. Because of the Insider Defendants' systemic misfeasance and malfeasance, the G2 Companies are presently nothing more than empty shells.

7. In perpetrating their scheme, the Insider Defendants violated their fiduciary duties owed to the G2 Companies. As explained below, the culpable defendants breached their duties of due care, good faith, loyalty and diligence in the management and administration of the affairs of the G2 Companies, as well as in the use and preservation of its property and assets. Specifically,

the Insider Defendants breached their fiduciary duties to the G2 Companies by depleting the companies' assets through self-serving transactions while the G2 Companies' minority shareholders were barred from withdrawing their investments. Therefore, Plaintiff, brings this action on behalf of G2 FMV (and for its subsidiary, G2 IG) to, *inter alia*, recover the damages caused to the G2 Companies by the Insider Defendants' misconduct.

8. Despite repeated requests since January 2020, the Insider Defendants have refused to produce any information regarding Plaintiff's investment. Even today, the full extent of the Insider Defendants' looting remains unclear because of their ongoing refusal to provide a proper accounting of the G2 Companies' books and records. As a result, much of the information underlying the Insider Defendants' fraudulent scheme and the true state of the G2 Companies' finances and operations are not available to Plaintiff because it resides exclusively within the possession and control of the Insider Defendants. Thus, the full scope of the Insider Defendants' malfeasance, and the harms to Plaintiff, must be ascertained through discovery.

## II.

## JURISDICTION AND VENUE

9. This Court has jurisdiction under the Exchange Act [15 U.S.C. § 78aa] because defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, electronic mails, interstate telephone communications, and the facilities of the national securities markets. 28 U.S.C. §1367(a) provides supplemental jurisdiction over all other claims asserted because they form part of the same case or controversy as the foregoing federal claims within the Court's original jurisdiction.

10. Venue is proper in this district pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], and many of the false and misleading statements were made in or issued from this district.

11. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants either reside in this district, and/or a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## III.

## PARTIES

### A. Plaintiff

12. Plaintiff Integrated Media Resources, LLC is a limited liability company organized and existing under the laws of Delaware. Its principal office is located in Dallas, Texas. Barrett Wissman is its agent. Mr. Wissman is a businessman with decades of experience in the media and entertainment industry.

### B. Nominal Defendants

13. Nominal Defendant G2 FMV, LLC is a limited liability company organized under the laws of Delaware with its principal place of business at 142 West 57th Street, New York, NY 10019.

14. Nominal Defendant G2 Investment Group, LLC is a limited liability company organized under the laws of Delaware with its principal place of business at 142 West 57th Street, New York, NY 10019.

### C. Insider Defendants

15. Jonathan Todd Morley a/k/a Todd Morley ("Morley") is an individual residing in New York State, with a last known address of 563 Park Avenue, New York, New York 10021. Morley was at all times relevant hereto, the Chairman of G2 FMV and the Chairman and Chief

Executive Officer of G2 IG. Morley was also a member of the Management Committee of G2 FMV and of the Executive Committee of G2 IG. At all relevant time periods stated herein, Morley acted as an officer, director, agent, subagent, partner, joint venturer, employee, and/or controlling person of G2 FMV and G2 IG and as an agent, partner, joint venturer, and/or co-conspirator of each of the other Defendants. In addition, Morley is the owner of Three Sticks LP. Three Sticks LP owned a 21.1% equity interest in G2 FMV. In addition, Three Sticks LP owned an equity interest in G2 IG.

16. Antonio de la Rua ("de la Rua") is an individual residing in New York State. Mr. de la Rúa is a Co-Founder of G2 IG, a member of the Management Committee of G2 FMV and of the Executive Committee of G2 IG. In addition, Defendant de la Rua is the owner of Luna Imperial, S.A. Luna Imperial, S.A owned a 21.1% equity interest in G2 FMV.

17. David Sams ("Sams") is an individual residing in the State of Florida. Sams was at all times relevant hereto, the Vice Chairman of G2 IG, a member of the Management Committee of G2 FMV and of the Executive Committee of G2 IG. In addition, Sams owned a 21.1% equity interest in G2 FMV.

18. Dori V. Karjian ("Karjian") is an individual residing in the state of Washington. Karjian was at all times relevant hereto, the General Counsel of both G2 FMV and G2 IG. Karjian was also Secretary of both the Management Committee of G2 FMV and Executive Committee of G2 IG. Karjian owned a 2.1% equity interest in G2 FMV.

19. Jonathan Lerman ("Lerman") is an individual residing in New York State. Lerman was at all times relevant hereto, the Chief Financial Officer ("CFO") of G2 FMV and G2 IG.

20. Maria Boyazny ("Boyazny") is an individual residing in New York State. Boyazny participated in G2 IG Executive Committee meeting through a separate contractual right. Boyazny

is the owner of MB Investment Group Holdings, LLC. MB Investment Group Holdings, LLC owned a 7% equity interest in G2 FMV.

21. The Nominal and Insider Defendants in this action are collectively referred to herein as "Defendants."

**IV.**

**DUTIES OF THE INSIDER DEFENDANTS**

22. The Insider Defendants are each officers and/or directors of the G2 Companies, and were entrusted with control over its business and corporate affairs by the companies' respective shareholders. As such, the Insider Defendants owed the G2 Companies, and their respective shareholders, fiduciary obligations of trust, loyalty, good faith and due care, and were required to use their utmost ability to control and manage the G2 Companies in a fair, just, honest and equitable manner. The Insider Defendants were further required to act in the best interests of the G2 Companies, to the benefit of all the companies' shareholders equally, and not for their own personal interest and/or benefit.

23. Each director and officer of the G2 Companies owed the companies, and their respective shareholders, a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the G2 Companies in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, the Insider Defendants had a duty to promptly disseminate accurate and truthful information with regard to the G2 Companies' revenue, margins, operations, performance, management, projections and forecasts so that the fair market value of the companies' shares would be based on truthful and accurate information.

24. Because of their positions of control and authority as directors and/or officers of the G2 Companies, the Insider Defendants were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein. Because of their advisory, executive, managerial and directorial positions with the G2 Companies, each of the Insider Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of the G2 Companies.

25. At all times relevant hereto, each of the Insider Defendants were the agent of the G2 Companies and were at all times acting within the course and scope of such agency.

26. To discharge their duties, the officers and directors of the G2 Companies were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the G2 Companies. By virtue of such duties, the officers and directors of the G2 Companies were required to, among other things:

- refrain from acting upon material inside corporate information to benefit themselves;
- ensure that the G2 Companies complied with its legal obligations and requirements;
- conduct the affairs of the G2 Companies in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the G2 Companies' assets, and to maximize the value of the its shares;
- properly and accurately guide investors as to the true financial condition of the G2 Companies at any given time, including making accurate statements about the G2 Companies' financial results and prospects, and ensuring that the G2 Companies maintained an adequate system of financial controls such that the G2 Companies' financial reporting would be true and accurate at all times;
- remain informed as to how the G2 Companies conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable

inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with relevant laws; and

- ensure that the G2 Companies were operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

27. Each Insider Defendant, by virtue of his or her position as a director and/or officer, owed to the G2 Companies and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the G2 Companies, as well as in the use and preservation of its' property and assets. The conduct of the Insider Defendants complained of herein involves knowing violations of their obligations as directors and officers of the G2 Companies, the absence of good faith, and a reckless disregard for their duties to the G2 Companies and its' shareholders, that the Insider Defendants were aware, or should have been aware, posed a risk of serious injury to the G2 Companies.

28. The Insider Defendants breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the G2 Companies to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent each of the other Insider Defendants from taking such illegal actions.

## V.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

29. In committing the wrongful acts alleged herein, the Insider Defendants pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged, the Insider Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

30. During all times relevant hereto, the Insider Defendants collectively and individually initiated a course of conduct that was designed to and did:

- Conceal the fact that the G2 Companies were improperly misrepresenting its respective business prospects and results;
- Make insider loans that directly resulted in improper payments to the Insider Defendants;
- Engage in insider transactions that benefitted the Insider Defendants' entities;
- Make concessions on insider loans that greatly reduced the G2 Companies' rights and returns; and
- Deceive investors, including Plaintiff, regarding the Insider Defendants' management of the G2 Companies' operations, financial health and stability, and its respective future business prospects.

31. In furtherance of this plan, conspiracy and course of conduct, the Insider Defendants collectively and individually took the actions set forth herein.

32. The Insider Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period to cause the G2 Companies to misrepresent their business prospects.

33. The purpose and effect of the Insider Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Insider Defendants' breaches of fiduciary duty, waste of corporate assets and unjust enrichment, and to conceal adverse information concerning the G2 Companies' operations, financial condition and future business prospects.

34. The Insider Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the G2 Companies to purposefully, recklessly and/or negligently release inaccurate statements. Because the actions described herein occurred under the authority of each of the G2 Companies' respective governing board of directors that were comprised exclusively of insiders, each of the Insider Defendants were a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

35. Each of the Insider Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Insider Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VI.

## FACTUAL ALLEGATIONS

### A. G2 INVESTMENT GROUP, LLC

36. G2 IG was established in 2008 "amid the fallout from the global financial crisis and massive deleveraging that ensued,"[1] to develop "investment strategies that take into account the fragilities of the investment world"[2] by focusing "on the principle that investments in basic 'pillars' of human need -- food, water, energy, shelter, health care, communication, education -- often create asymmetrical return profiles, many of which act as a hedge against inflation."[3]

[1] *See* Exhibit 1 at 1.

[2] *See* Exhibit 2 at 2.

[3] *See* Exhibit 2 at 16.

37. According to the Amended and Restated Limited Liability Company Agreement of G2 Investment Group ("G2 IG Operating Agreement") dated June 30, 2010, a "key part of the Company's investment activities [was] to identify investment opportunities and create, staff and invest in general partnerships, limited liability companies, limited partnerships and other operating entities [to] attract third-party investors for such investment opportunities."[4]

38. G2 IG's "Founding Members" included Morley and de la Rua.[5] The business and affairs of G2 IG were managed and controlled by its Executive Committee, which was comprised by Morley and de la Rua and Sams. The Members of the Executive Committee acted as "Managers" pursuant to the Delaware Limited Liability Company Act. Morley was also G2 IG's Chief Executive Officer.

39. Pursuant to the G2 IG Operating Agreement, capital contributions by the Founding Members were made through the Founding Members Vehicle. "Founding Members Vehicle" is defined as G2 FMV, LLC.[6]

**B. <u>G2 FMV, LLC</u>**

40. G2 FMV was established in 2009 as the parent company of G2 IG. According to Defendant Morley, it was structured similarly to a special purpose vehicle and meant to hold the shares of the employees of G2 IG.[7] G2 FMV's purpose and scope, as defined under the Amended and Restated Limited Liability Company Agreement of G2 FMV ("G2 FMV Operating Agreement") dated January 5, 2011, was to: (a) to conduct, directly or indirectly, its Business; (b)

---

[4] *See* Doc. No. 53, G2 IG Operating Agreement, *G2 FMV, LLC v. Patrick J. Thomas*, Index No. 650753-2014 (Sup. Ct. New York Cty), attached hereto as Exhibit 3 at 2.3.

[5] *Id.* at 5.

[6] *Id.*

[7] *See* Doc. No. 34, Excerpts from Deposition of J. Todd Morley, *Patrick J. Thomas v. G2 FMV, LLC*, Index No. 152136-2017 (Sup. Ct. New York Cty), attached hereto as Exhibit 4.

to do any and all other acts or things that may be necessary, appropriate, proper, advisable, incidental to, or convenient for the furtherance and accomplishment of [its] Business.[8] "Business" is defined as, "the business of holding and managing interests in G2 Investment Group, LLC, [and] other business or activities as may from time to time be agreed upon by all of [its] Members."[9]

41. The business and affairs of G2 FMV were managed and controlled by its Management Committee, which – like G2 IG – was comprised by Defendants Morley and De la Rua and Sams. The Members of the Management Committee acted as "Managers" pursuant to the Delaware Limited Liability Company Act.

42. Pursuant to the terms of the G2 FMV Operating Agreement, no member had the right to withdraw any of its contribution or the right to any distribution; except if the Management Committee, which majority included Defendant Morley, for so long as he was a member of the Management Committee, determined to do so. Morley has at all relevant times been a member of the Management Committee. Plaintiff never received a distribution from G2 FMV during the seven years during which it was a member of G2 FMV.

43. G2 IG and G2 FMV at all relevant times operated its business in the same office and shared resources, including staff, expenses, and bank accounts.

## C. DEFENDANTS' SOLICITATION OF PLAINTIFF'S PURCHASE OF G2 SECURITIES

44. In January of 2014, Wissman was introduced to Defendant Morley through a mutual acquaintance. Wissman was informed of Morley's experience in the investment industry as the co-founder of Guggenheim Partners, an investment management firm which supervised

---

[8] *See* Doc. No. 24, G2 FMV Operating Agreement, *G2 FMV, LLC v. Patrick J. Thomas*, Index No. 650753-2014 (Sup. Ct. New York Cty), attached hereto as Exhibit 5 at 10.

[9] *Id.* at 3.

approximately $170 billion of assets. Thus, a teleconference was subsequently scheduled between Wissman and Morley to discuss potential joint venture business and investment opportunities.

45. By email dated January 10, 2014, Wissman received two documents entitled, "G2 Investment Group Investor Presentation"[10] and "G2 Investment Group Projections Model Assumptions & Summary Output"[11] and wrote: "Confidential but very good for you to have for the call with [Morley]."[12]

46. On the call, Morley described the G2 Companies' business venture, its plan to develop a "G2 Media" platform strategy and Wissman's potential involvement. Morley and Wissman also separately discussed investment opportunities offered by G2 IG, as described below.

## D. FORMATION OF THE JOINT VENTURE

47. By email dated February 2, 2014, Wissman communicated to Morley his interest in developing platform strategy with G2 IG and wrote: "I have been thinking about the concept of a G2 media platform. I think its (sic) something I am interested in in theory and still need to get feedback on all the legal implications and how we structure the project, but here are my basic thoughts, questions and the like..."[13]

48. Between February and September 2014, Wissman and Morley explored, discussed, and reached agreements as to various ownership, management, and financing options pursuant to the joint business venture.

---

[10] *See* Exhibit 2.

[11] *See* Exhibit 6.

[12] *See* Exhibit 7.

[13] *See* Exhibit 8.

49. As a result of those discussions and agreements, both Wissman and Morley agreed to transfer projects and assets, invest, and/or commit to loan or invest several millions of dollars, into the proposed business venture and related projects.

50. Among other things, Wissman agreed to transfer projects in the media and entertainment business to the venture, in return for, receipt of ownership interests in the venture. In turn, Morley agreed to invest seed capital in the proposed business venture, also in return for ownership interests in the venture.

51. As a result of the above meetings, discussions, and agreements, a new entity was formed under the name G2 Media and Entertainment.

## E. FAIR MARKET VALUE OF G2 SECURITIES

52. Meanwhile, on March 3, 2014, the Chief Operating Officer ("COO") of G2 IG resigned and notified the Management Committee of G2 FMV that he was exercising his option to require G2 FMV to purchase his security interest in G2 FMV, 20,200 G2 FMV Class A Common Units, at its fair market value.[14]

53. "Fair Market Value," is defined as the fair market value that G2 FMV is sold and distributed in accordance with the provisions of the G2 FMV Operating Agreement. The Management Committee of G2 FMV is responsible for determining the Fair Market Value; however, if the member disagrees, the agreement provides that an appraiser will be appointed to determine the Fair Market Value.[15]

[14] *See* Doc. No. 6, Unit Purchase and Settlement Agreement, *Patrick J. Thomas v. G2 FMV, LLC,* Index No. 152136-2017 (Sup. Ct. New York Cty), attached hereto as Exhibit 9 at 1.

[15] *See* Exhibit 5 at 5-6.

54. Pursuant to Section 9.1 of the G2 FMV Operating Agreement, G2 FMV was required, upon demand, to purchase all 20,200 of the former COO's Vested G2 Units in G2 FMV for the Fair Market Value.[16]

**F. <u>G2 IG'S PRIVATE OFFERING</u>**

55. G2 FMV's securities were not easily valued by reference to market data because they were not publicity traded. Therefore, the methodology employed to value G2 FMV's assets, (including G2 IG, its biggest asset) were critically important and material to investors' decision as to whether to invest in G2 FMV.

56. According to the Projections Model Assumptions & Summary Output presentation, investors were provided 15-year financial projections net income streams from Grafton Energy Capital, MB Global, LCN Capital Management, and additional fund strategies.[17] Per the presentation, the private placement securities of G2 IG were valued in excess of $347.6 million and included 2014 NPV Projections with a deeply discounted cashflow-based valuation to Fair Market Value purchase price which produced a 43.7% Internal Rate of Return and 99.1 Multiple of Invested Capital.[18]

57. By email dated March 31, 2014, Wissman wrote to Morley: "I am also willing to make an investment in the partners' LLC of G2 [IG] (as I understand it)" and proposed that he would do so by making a "$1-2mm investment into the G2 [IG] parent partners' entity."[19]

---

[16] *Id.* at 29.

[17] *See* Exhibit 6 at 3.

[18] *Id.* at 5.

[19] *See* Exhibit 10.

58. Between March and May 2014, Wissman received additional G2 IG marketing materials, including an updated G2 IG Investor Presentation, dated March 2014,[20] and Financial Statements of G2 IG for 2012[21] and 2013.[22] Wissman also received marketing materials advertising investment opportunities in G2 IG's joint ventures with two of its partners, Rising Realty Partners and Grafton Asset Management. In addition to the documents that Wissman received in January, these documents are collectively referred to as the "Offering Materials."

## G. <u>PLAINTIFF'S PURCHASE OF G2 FMV SECURITIES</u>

59. By email dated May 13, 2014, Wissman received from Karjian a subscription packet for the purchase of 22,864 G2 FMV Class A Common Units for $1.5 million. The packet consisted of the Subscription Agreement, G2 FMV's Operating Agreement, and a Joinder Agreement to G2 FMV's Operating Agreement (collectively, the "Agreements"[23]).

60. On May 15, 2014, just two days later, Wissman received an uncharacteristically urgent email from an employee of G2 stating: "We have to close and fund this week--bottom line per [Morley]." Concerned over the implied urgency in that message, and in light of the fact that there still remained outstanding issues that needed to be resolved, Wissman responded, "If G2/I sign the documents and I am committed to funding, what makes you think I would not and what difference is it? Is there some major cash flow problem?"[24]

[20] *See* Exhibit 11.

[21] *See* Exhibit 12.

[22] *See* Exhibit 13.

[23] *See* Exhibit 14.

[24] *See* Exhibit 15.

61. When the employee failed to respond, Wissman forwarded the email directly to Morley and asked again, "Todd, I am waiting for comments and the timing in the docs was set by you guys, not by me. Is there some major cash flow problem?"[25]

62. In response, Morley wrote, "No, we just crushed it here and I want this done." "As an entrepreneur you can appreciate that It's (sic) a pain in the ass the (sic) heard (sic) everyone! If we don't inject some urgency, people go on for ever (sic) which isn't fair. I'd say that we hit a grand slam here for Rising so that's it for this cheap valuation !!"[26] Despite Morley's representation that there were no major cash flow problems, G2 IG was in fact in desperate need for a cash infusion, as described in detail below.

63. On or about July 6, 2014, acting in reliance upon the representations made by Morley, the content and provisions of the Offering Materials, and other communications described herein, Wissman executed the Subscription Agreement,[27] G2 FMV's Operating Agreement,[28] and the Joinder Agreement to G2 FMV's Operating Agreement[29] on behalf of Plaintiff and wired $1.5 million to a bank account belonging to G2 IG, purchasing 22,864 G2 FMV Class A Common Units.

## H. <u>TROUBLE BEHIND THE SCENES</u>

64. In truth, contrary to the optimistic portrayal painted by defendants, G2 IG was a debt and expense-laden shell of non-owned and/or non-existent assets and projects.

---

[25] *Id.*

[26] *Id.*

[27] *See* Exhibit 16.

[28] *See* Exhibit 17.

[29] *See* Exhibit 18.

65. From its inception, G2 IG was in need of investment capital to become or remain viable, meet its financial obligations as they became due, and pursue its business plan. As a result, the Insider Defendants engaged in various fraudulent schemes to solicit investments from potential investors and concocted myriad financial schemes to deceive its existing investors to create an illusion that their investments were performing.

66. Specifically, in or around October 2013 and continuing through 2014, the Insider Defendants participated in a scheme to solicit investments by misrepresenting the true nature of G2 IG's purported assets, which were illiquid, grossly over-valued, worthless, and in some instances, non-existent.

67. Plaintiff's investment was made in reliance on false and misleading statements made by and with the knowledge and complicity of the Insider Defendants. Specifically, the following material should have been disclosed to Plaintiff prior to the investment:

- the highly unstable financial, management, and operating condition of the G2 Companies, as described below (infra ¶¶ 73 to 79);
- its tax liability issues, as described below (infra ¶¶ 80 to 86);
- the true facts about the G2 Companies' assets, as described below (infra ¶¶ 87 to 110);
- the materially false and misleading statements attributed to G2's bad faith valuations, as described below (infra ¶¶ 111 to 118).

68. These facts were not disclosed to Wissman in the Offering Materials, or in any other communications that occurred prior to Plaintiff's investment.

69. Each of the above facts were material to Wissman's decision to invest, particularly since he intended to invest funds that belonged both to him and other investors. If Wissman had been provided the facts, he would not have proceeded with the investment. Morley knew that if

Wissman were made aware of these facts, he would have had no interest in proceeding with the investment.

70. Eventually, when G2 IG, faced with mounting legal liabilities, failed as a result the Insider Defendants' mismanagement, the Insider Defendants embarked upon a scheme to use G2 IG as vehicle for non-G2 purposes - serving only to benefit themselves at the expense of their investors.

71. The following sections of this Complaint discuss Defendants' widespread, active, and knowing role in designing, creating, funding, implementing, facilitating, marketing and masking numerous deceptive and fraudulent schemes that have deceived and injured investors, including Plaintiff.

## I. G2'S UNSTABLE FINANCIAL, MANAGEMENT, AND OPERATING CONDITION

72. Prior to Plaintiff's investment, G2 IG's credibility with investors, clients and federal regulators was virtually destroyed as a result of the Insider Defendants' improper financial reporting and gross mismanagement. In an effort to hide their wrongdoing and attract new unsuspecting investors, the Insider Defendants fabricated and disseminated false and materially misleading financial statements.

73. The Insider Defendants created G2 IG's materially false and misleading financial statements from 2010 to 2013 meant to attract potential investors, including Plaintiff. Those statements never came close to accurately disclosing G2 IG's true financial performance and deteriorating viability as an ongoing business enterprise. The result of this deception was the precipitous financial collapse of the G2 Companies.

74. On April 24, 2014, Lerman sent Plaintiff audited financial statements for 2012[30] and unaudited financial statements for 2013[31] containing materially false and misleading information.

75. On April 29, 2014, Lerman admitted to a former investor, that "G2 erred in sending [him] a K-1 for 2010," for an investment of $1,000,000 in 2011 that was inappropriately back-dated and treated as a loan, purportedly by mistake. Lerman expressed, "G2 apologizes for that mistake," and assured that "G2 was working with its outside accounting firm to correct G2's records and filings."[32]

76. Despite knowing and admitting that a mistake in accounting had been made that would have materially altered the information that was sent to Plaintiff, and indicating that Defendants would revise its financial statements, Defendants failed to inform Plaintiff of this purported error and did not provide Plaintiff a corrected version of the financial statements at any time prior to Plaintiff's investment.

77. In doing so, Defendants concealed material information relating to management's conduct. Conduct that demonstrates a lack of integrity in the financial statements was relevant to Plaintiff's prior to its purchase of G2 securities.

78. These facts would have been highly material to Plaintiff's decision to invest, if disclosed.

[30] *See* Exhibit 12.

[31] *See* Exhibit 13.

[32] *See* Doc. No. 2, Complaint, Christian Sullivan And UNIS Venture Fund, LLC v. G2 Investment Group, LLC AND J. Todd Morley, Index No. 653991-2014 (Sup. Ct. New York Cty), attached hereto as Exhibit 19.

**J. UNDISCLOSED TAX LIABILITIES**

79. The financial statements sent to Plaintiff in 2014 were also materially false and misleading because they did not properly disclose a multi-million-dollar tax liability owed to the IRS that would have been relevant to Plaintiff's decision to purchase G2 securities.

80. In April 2014, Defendants were actively negotiating a confidential resolution with the IRS to pay off its substantial tax liabilities due its failure to pay between 40-50% of what should have been paid for payroll taxes in 2012, and close to 100% of what was due for the first two quarters of 2013, while it was simultaneously soliciting Plaintiff and other investors. Unbeknownst to Plaintiff, the total IRS exposure to G2 for these periods was nearly $3 million at its peak, inclusive of penalties.[33]

81. The negotiations with the IRS occurred: (a) with the knowledge, consent, and authority of each Defendant; (b) without disclosure to Plaintiff; and (c) contrary to the representations contained in the financial statements sent to Plaintiff.

82. The financial statements were materially false and misleading because they did not include information relating to its tax liabilities.

83. By omitting tax liabilities from its financial statements, Defendants concealed material information relating to G2 IG's recurring cash flow issues. Any cash flow issues were relevant to Plaintiff's prior to its purchase of G2 securities.

84. These facts would have been highly material to Plaintiff's decision to invest, if disclosed.

[33] *See* Doc. No. 51, IRS Installment Plan, *G2 FMV, LLC v. Patrick J. Thomas*, Index No. 650753-2014 (Sup. Ct. New York Cty), attached hereto as Exhibit 20.

85. In fact, Morley knew it would be relevant to Wissman because Wissman specifically asked him whether there were any cash flow problems in May 2014 prior to Plaintiff's investment. Morley said there were no cash flow problems.

**K. G2'S FRAUDULENT ASSETS**

86. The Insider Defendants regularly and repeatedly misrepresented G2 IG's Assets Under Management ("AUM") to Plaintiff and inflated that figure to mislead Plaintiff into believing that G2 IG owned assets that were larger than it was to induce Plaintiff to invest. According to a presentation given to Wissman, G2 IG purported to provide an ongoing support platform for three strategies, including two entities that Morley co-founded: MB Global and Grafton Energy Capital. In return, G2 IG claimed to "retain an ownership participation in each of those strategies."[34]

**1. MB Global**

87. On October 25, 2010, a press release was issued announcing the launch of MB Global Partners by Boyazny "in partnership with G2 IG" to provide "investment management, advisory and other financial services to institutional investors and private clients around the world."[35]

88. MB Global Partners LLC is a Delaware limited liability company that was formed on December 27, 2011. Its principal place of business is located at 142 West 57th Street, 12th Floor, New York, NY 10019, the same as the G2 Companies.

89. MB Global Advisers LLC is a Delaware limited liability company that was also formed on December 27, 2011. It is a subsidiary of MB Global Partners and its principal place of business is also located at 142 West 57th Street, 12th Floor, New York, NY 10019.

---

[34] *See* Exhibit 6 at 1.

[35] *See* Exhibit 43.

90. MB Special Opportunities Fund LP was a private fund that was managed by MB Global Advisers.[36]

91. In a joint presentation by G2 IG and MB Global Partners, MB Special Opportunities Fund, LP was described to potential investors as having approximately $400 million under management.[37] In addition, MB Global Partners is described as being "supported by G2 Investment Group" and that MB Global Partners would "benefit from synergies created by leveraging the broader G2 platform's market industry intelligence/expertise and relationships."[38]

92. Although Wissman was led to believe G2 IG would receive revenue from its ownership stake in MB Global; in reality, G2 IG was being used to pay for the operational expenses of MB Global (including salaries, bonuses and employee benefits).

93. MB Credit HoldCo, LLC is an entity owned by MB Global Partners and G2 IG. MB Credit HoldCo, LLC is a Delaware limited liability company that was also formed on December 27, 2011, the same day as MB Global Partners and MB Global Advisers.

94. According to Section 3.4(d) of the Operating Agreement of MB Credit HoldCo, LLC, dated October 19, 2010, it states: "Until such time as the Company's assets under management (together with the assets under management of the Company's subsidiaries) equals or exceeds $500 million (the "$500 AUM Date"): (i) [G2IG] shall employ and pay all compensation of, and bear all costs of providing benefits to, those persons dedicated to the operation of the Company (the "Company Staff"), including (A) Boyazny, (B) the first investment professional hired by the Company (other than Boyazny), who is selected by [MB Global Partners]

[36] *See* Exhibit 45 at 3.

[37] *See* Doc. No. 58, MB Special Opportunities Fund, L.P., Patrick J. Thomas v. G2 FMV, LLC, Index No. 154593-2017 (Sup. Ct. New York Cty), attached hereto as Exhibit 36 at 1.

[38] *Id.* at 23.

and approved by [G2 IG], in its reasonable discretion (the "First Investment Professional"), and (C) an executive assistant to Boyazny."[39]

95. Boyazny, Morley, Lerman and Karjian are employees of MB Global Partners.[40]

**2. <u>Grafton Energy Capital</u>**

96. On May 10, 2014, Wissman received a presentation featuring a joint venture between G2 IG and Grafton Asset Management called Grafton Energy Capital.[41] At the top of the Executive Summary, the presentation claimed that Grafton Energy Capital "work[ed] with energy firms and global investors to finance and provide investment capital for the most promising opportunities in the Canadian energy sector."[42]

97. Based on the representations made by Defendants, Plaintiff was led to believe that pursuant to the partnership between Grafton Asset Management and G2 IG, Defendants would raise $200 million in on-balance-sheet equity capital from their circle of private investors towards Grafton Energy Capital to invest in high-growth Canadian energy companies across various subsectors.[43]

98. Defendants' Offering Materials also represented that G2 [IG] would receive as revenue one-third of the cash flow generated by the Grafton [Energy Capital] business," and financial forecasts for Grafton Energy Capital between 2014 to 2019 were included in G2 IG's AUM calculation. [44]

---

[39] *See* Doc. No. 44, Patrick Thomas Affidavit, dated July 13, 2017, *Patrick J. Thomas v. G2 FMV, LLC,* Index No. 154593-2017 (Sup. Ct. New York Cty), attached hereto as Exhibit 44 at 14-15.

[40] *See* Exhibit 36 at 3.

[41] *See* Exhibit 22.

[42] *Id.* at 3.

[43] *Id.*

[44] *See* Exhibit 6 at 2-3.

99. These statements were materially false and misleading. Morley failed to raise the $200 million in capital and the planned partnership with Grafton Asset Management failed in 2013.[45] Despite the failed partnership, Defendants misled investors by withholding relevant material information and improperly valued Grafton Energy Capital in 2014.

100. The Insider Defendants knew that Grafton Energy Capital was worthless in 2014, as evidenced by a letter written by Karjian acknowledging that Grafton Energy Capital was not actively part of G2 IG as of March 3, 2014.[46] Thus, Grafton Energy Capital was wildly overvalued and should not have been included in G2 IG's AUM calculation to investors.

**3. Rising**

101. On May 10, 2014, Wissman received a presentation featuring a joint venture between G2 IG and Rising Realty Partners called Rising Realty Merchant Bank ("Rising").[47]

102. Plaintiff was initially informed that Rising offered "a permanent source of capital to opportunistically pursue investment initiatives to acquire, develop or finance real estate assets based on changing market cycles through multiple and diversified trading strategies."[48] In addition, the presentation stated that Rising would generate fee and investment income, and that all profits would be up streamed to maximize book value.

103. As described above with regard to Grafton Energy Capital, the Rising Transaction possessed a number of similar characteristics: (i) the investments were not readily marketable; (ii)

---

[45] *See* Doc. No. 41, Defendants' Verified Amended Answer to Complaint and Counterclaims, J. Todd Morley and G2 Investment Group, LLC v. Grafton Asset Management, LTD., Grafton Energy Capital, Richard A. Grafton and Geeta Sankappanavar, Index No. 650293-2018 (Sup. Ct. New York Cty), attached hereto as Exhibit 24 at 19, Paras. 107 - 109.

[46] *See* Doc. No. 30, Letter from D. Karjian to C. Mercer, dated January 27, 2016, *Patrick J. Thomas v. G2 FMV, LLC,* Index No. 152136-2017 (Sup. Ct. New York Cty), attached hereto as Exhibit 23 at 2, Para. 3.

[47] *See* Exhibit 21.

[48] *Id.* at 3 (Rising Realty Merchant Bank – Investor Presentation)

to hide the true nature of the "assets," the investments were largely structured with multiple intermediate holding vehicles that did not contribute any economic value or purpose with respect to the investments and generally placed the right to control the management of the investments with a G2 affiliate; and (iii) the value of the underlying assets were misrepresented and/or grossly overstated.

104. The Insider Defendants, because of their positions with the G2 Companies as officers and directors, possessed the power and authority to control the contents of the G2 Companies' Offering Materials, its financial statements and other representations made in the sale of G2 FMV securities to Plaintiff. Each of the Insider Defendants either disseminated the false and misleading information contained in the Offering Materials or knew that these statements were being made to potential investors.

105. Defendants are liable for the false statements pleaded herein, as each one of those statements were "group-published" information, the result of the collective actions of the Insider Defendants.

106. As alleged herein, each of the Insider Defendants acted with scienter because each defendant knew or recklessly disregarded that the documents and statements issued or disseminated in the name of the G2 Companies were materially false and misleading or omitted facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

107. Each Insider Defendant knew that such statements or documents would be issued or disseminated to investors and knowingly and substantially participated in, or acquiesced in the making, issuance or dissemination of such statements or documents, in violation of the federal securities laws.

108. By virtue of their receipt or reckless disregard of information reflecting the true facts regarding the G2 Companies, their control over and/or receipt and/or modification of G2 IG's materially misleading statements, and/or their other associations with G2 IG, each defendant knowingly or recklessly participated in the fraudulent scheme and conduct alleged herein.

109. These facts would have been highly material to Plaintiff's decision to invest, if disclosed.

## L. FALSE VALUATIONS

110. Beginning in January 2014 and through the date of Plaintiff's purchase of G2 FMV Units, Defendants valued G2 IG on a discounted cashflow basis at $347.6 million[49] and valued 22,864 G2 FMV Class A Common Units to be worth $1.5 million.[50]

111. Meanwhile, unbeknownst to Plaintiff, Defendants were also in the midst of resolving a dispute with the former COO of the G2 Companies relating to Defendant's obligation to repurchase the COO's ownership interest of 20,200 G2 FMV Class A Common Units.

112. In dispute was the Fair Market Value of the COO's G2 FMV Units as March 3, 2014, the last date of his employment.[51] Per the G2 FMV Operating Agreement, the Management Committee of G2 FMV was responsible for determining the Fair Market Value of the COO's G2 FMV Units.

113. "Fair Market Value," is defined under the G2 FMV Operating Agreement as "the fair market value that G2 FMV is sold and distributed in accordance with the provisions of the G2 FMV Operating Agreement."[52]

---

[49] *See* Exhibit 6 at 5.

[50] *See* Exhibit 16.

[51] *See* Exhibit 9 at 1.

[52] *See* Exhibit 5 at 4-5.

114. On July 7, 2014, Plaintiff invested $1.5 million in the G2 Companies based on Defendants' representations and valuation of G2 IG and G2 FMV by purchasing 22,864 G2 FMV Class A Common Units.

115. On September 11, 2014, the Management Committee of G2 FMV valued G2 IG on a discounted cashflow basis at $0.00 and determined that the Fair Market Value of the former COO's 20,200 G2 FMV Class A Common Units to be worth only $633,343;[53] far less than the amount presented to Plaintiff.

116. Given the proximity in timing from the valuation of Plaintiff's Class A Common Units, and because it bore the same terms and were part of the same issue as the COO's Class A Common Units, the market values should have been similar if not identical.

117. These facts would have been highly material to Plaintiff's decision to invest, if disclosed.

## M. HIDING UNDISCLOSED LOSSES AND FRAUDULENT LOANS

118. Within months of Plaintiff's investment, G2 IG incurred substantial losses due to the failed partnership with Grafton Asset Management. In order to keep the substantial debts from this failed business venture off of G2 IG's balance sheet and out of the view of its investors, the Insider Defendants concealed these losses by transferring them to G2 FMV through sham "loans" timed to occur at the end of the G2 Companies' financial reporting period.

119. Specifically, G2 IG entered into two loans totaling $4 million with an investment company named Brevet Direct Lending – Short Duration Fund, L.P., ("Brevet") dated October 14, 2016 and November 15, 2016, respectively.[54] On the same date of the first loan dated October 14,

---

[53] *See* Exhibit 9 at 1.

[54] *See* Doc. No. 40, Brevet loan agreements, dated October 14, 2016 and November 15, 2016, *Patrick J. Thomas v. G2 FMV, LLC,* Index No. 154593-2017 (Sup. Ct. New York Cty), attached hereto as Exhibit 34.

2016, G2 FMV pledged as collateral its equity interest in G2 IG to guarantee the loan between G2 IG and Brevet for $3 million.[55] The proceeds from the Brevet loans, however, were not reflected in G2 IG's consolidated balance sheet as of December 31, 2016.

120. The Insider Defendants used this technique repeatedly. This scheme was designed to (and did) enable G2 IG to temporarily transfer massive losses off its books by shifting them between G2 FMV and related-party companies owned and controlled by the Insider Defendants.

121. The goal of this scheme was to disguise millions of dollars of losses so that G2 IG could fraudulently avoid recording millions of dollars in write-offs and continue to project to the public and potential investors a false impression of financial health.

122. As of October 2016, G2 IG purportedly owed approximately $18.5 million in outstanding loans to entities controlled by Morley, de la Rua, and Sams, and the other Insider Defendants.[56] They are documented as follows:

| | |
|---|---|
| G2 FMV, LLC: | $1,631,584 |
| THREE STICKS, LP: | $8,634,561 |
| LUNA IMPERIAL S.A.: | $177,009 |
| DAVE SAMS: | $1,363,387 |
| AZURITE ASSET HOLDING: | $6,714,257 |
| **TOTAL**: | **$18,520,798** |

123. By the end of 2017 and 2018, G2 IG purportedly incurred liabilities in the amount of approximately $20.5 million and $18.8 million, respectively, in outstanding "loans."

[55] *See* Doc. No. 41, Guaranty and Collateral Agreement between Grantors and Brevet, dated October 14, 2016, *Patrick J. Thomas v. G2 FMV, LLC,* Index No. 154593-2017 (Sup. Ct. New York Cty), attached hereto as Exhibit 35.

[56] *See* Exhibit 34 at Schedule 6.03(B).

**1. G2 FMV, LLC**

124. On October 14, 2016, the Insider Defendants used G2 FMV to secure a $3 million dollar loan from Brevet by pledging 840,000 A Common Units, totaling 77.5% and 10,000 Class A Preferred Units, totaling 6.25% as collateral.[57]

**2. THREE STICKS, LP**

125. Morley is the Founder and Managing-Member of Three Sticks LP, G2 IG and G2 FMV.

126. Morley's residential address and Three Sticks LP's principal place of business is located at 563 Park Avenue, 10E, New York, NY 10022.

127. Karjian is Principal and General Counsel of Three Sticks, LP.[58]

128. In or around 2010, Three Sticks, LP invested 125,000 Class A Units of Northern Gulf Partners, LLC, representing 8.22% of total issued and outstanding units of Northern Gulf Partners, LLC in G2 IG.[59]

129. In or around 2011, Three Sticks, LP invested $2,150,000, acquiring 10,000 Class A Units, which represents 18.92% of total issued and outstanding units of G2 FMV.[60]

130. In or around 2012, Three Sticks, LP invested $150,000, and all right title and interest in and to 100% of the equity stake in G2 IG into G2 FMV, to acquire 200,000 Class A Units, which represents 23.32% of total issued and outstanding units of G2 FMV.[61]

---

[57] *See* Exhibit 35 at Schedule 1.

[58] *See* Exhibit 36 at 20.

[59] *See* Exhibit 3 at Appendix E.

[60] *See* Exhibit 37.

[61] *See* Exhibit 5 at Schedule 1.

131. On October 14, 2016, Morley caused Three Sticks, LP to pledge 9,900 Class A Units and 9,900 Class B Units, representing 99% of total issued and outstanding units of Three Sticks, LP, as collateral to secure a $3 million dollar loan from Brevet for G2 IG.[62]

132. According to a capitalization table for G2 FMV dated December 31, 2019, Three Sticks L.P., invested $350,000, acquiring 200,000 Class A Units, which represents 21.16% of total issued and outstanding units of G2 FMV.[63]

### 3. <u>LUNA IMPERIAL S.A.</u>

133. De la Rua is the Founder and Luna Imperial S.A and a Founding Member of G2 IG.[64]

134. Luna Imperial S.A., G2 IG and G2 FMV's principal place of business is located at 142 W. 57th Street, 12th Floor, New York, NY 10019.

135. In or around 2011, Luna Imperial S.A. invested $150,000 in G2 FMV, and acquired 10,000 Class A Units, representing 18.92% of total issued and outstanding units of G2 FMV.[65]

136. In or around 2012, Luna Imperial S.A.'s ownership inexplicably increased to 200,000 Class A Units, representing 23.32% of total issued and outstanding units of G2 FMV despite its investment total remaining the same.[66]

137. According to a capitalization table for G2 FMV dated December 31, 2019, Luna Imperial S.A.'s investment of $1,000,000 remained the same; however, Luna Imperial S.A.'s

---

[62] *See* Exhibit 35 at Schedule 1.

[63] *See* Exhibit 38.

[64] *See* Exhibit 3 at 5.

[65] *See* Exhibit 37.

[66] *See* Exhibit 5 at Schedule 1.

ownership increased to 200,000 Class A Units, representing 21.16% of total issued and outstanding units of G2 FMV.[67]

### 4. DAVE SAMS

138. In or around 2011, Sams invested $1,000,000 in G2 FMV, and acquired 21,700 Class A Units, representing 2.53% of total issued and outstanding units of G2 FMV.[68]

139. According to a capitalization table for G2 FMV dated December 31, 2019, Sams' investment of $1,000,000 remained the same; however, Sams' ownership increased to 200,000 Class A Units, representing 21.16% of total issued and outstanding units of G2 FMV.[69]

### 5. AZURITE ASSET HOLDING LLC

140. Azurite Asset Holding's principal place of business is located at 1111 Brickell Avenue, Suite #2802, Miami, Florida 33131.

141. Guggenheim Partners LLC, an investment and advisory financial services firm, is also located at 1111 Brickell Avenue, Suite #2802, Miami, Florida 33131.

142. Morley is a co-founder of Guggenheim Partners and continued to engage in activities relating to Guggenheim Partners, LLC throughout the Relevant Period.[70]

143. Sams served as a Director of Guggenheim Capital, LLC, an affiliate of Guggenheim Partners, until August 2011.

## N. INSOLVENCY OF G2 FMV AND G2 IG

144. Eventually, the Insider Defendants' fraudulent transactions caused the G2 Companies to become insolvent. The foregoing transactions orchestrated and implemented by the

---

[67] *See* Exhibit 38.

[68] *See* Exhibit 5 at Schedule 1.

[69] *See* Exhibit 38.

[70] *See* Exhibit 3 at Section 3.9(c).

Insider Defendants were concealed from the G2 Companies' investors and were unknown to them at the time they occurred.

145. On March 3, 2017, Lerman filed an affidavit in an unrelated matter admitting that both G2 FMV and G2 IG were insolvent.[71] According to Lerman, G2 IG and G2 FMV were experiencing a "liquidity shortage primarily associated with a revenue shortfall" and because the G2 Companies' liabilities exceeded its assets, it was unable to meet its debt obligations.[72]

146. On July 14, 2017, unaware of the G2 Companies' dire financial situation, Wissman asked Morley for copies of the G2 Companies' audited financial statements for 2015 and 2016.

147. On July 20, 2017, Plaintiff received "Financial Statements" stating the "Year to Date" showing "Profit or Loss," but did not show any Fund investments for the period in question.

148. Morley also responded, copying Sams: "Asking [Sams] and [Lerman], apologies. They're not worth very much as an indicator of our progress...as there is continued, low cash flow. We are doing fine but the value is in the appreciation of stuff like Rising. All cash flows have been reinvested so the financials don't really tell the whole story."[73]

149. Per Karjian's own admission, G2 IG has never received any revenue from Rising.[74]

## O. <u>MOVING ON</u>

150. Based on the misrepresentations by the Insider Defendants, Plaintiff remained unaware of the G2 Companies' insolvency and believed that G2 IG's assets were performing well

---

[71] *See* Doc. No. 261, Affidavit of Jonathan Lerman, *Patrick J. Thomas v. G2 FMV, LLC et al.*, Index No. 152318-2015 (Sup. Ct. New York Cty), attached hereto as Exhibit 25.

[72] *Id*. at 2.

[73] *See* Exhibit 26.

[74] *See* Doc. No. 479, Affidavit of Dori Karjian, *Patrick J. Thomas v. G2 FMV, LLC et al.*, Index No. 152318-2015 (Sup. Ct. New York Cty), attached hereto as Exhibit 40 at 3.

from 2017 through 2018. In reality, the Insider Defendants were already moving on to their new ventures.

151. On May 15, 2018, for example, a press release was issued by "Guggenheim Partners LLC and G2 Co-Founder J. Todd Morley and a consortium of investors and co-founders" announcing the launch of Y2X, "a new blockchain-centric company."[75]

152. Morley is currently the Chairman of Y2X, Inc.[76] Y2X was incorporated in Delaware on August 28, 2017. Its principal place of business is also located at 142 West 57th Street, New York, NY, the same address as the G2 Companies.

153. In addition, Plaintiff was also given financial statements with false information. For example, according to the statements for the year ending in 2018, G2 IG supposedly sold an entity referred to as Stratford Securities, LLC for $4,972,223.[77] However, Plaintiff later discovered that Stratford Partners was actually sold to Y2X for only $2.5 million.[78]

154. Stratford Securities, LLC's d/b/a is Stratford Partners.[79] Its principal place of business is located at 142 W. 57th Street, 12th Floor, New York, NY 10019, the same address as the G2 Companies and Y2X.[80]

## P. <u>PLAINTIFF'S FINAL NOTICE AND DEMAND</u>

155. On February 14, 2019, in response to Plaintiff's request for the financial statements of G2 IG for the years ending in 2017 and 2018, Karjian responded: "I apologize for the tardiness

---

[75] *See* Exhibit 41.

[76] *See* Exhibit 42.

[77] *See* Exhibit 28 at 1.

[78] *See* Exhibit 40 at 3.

[79] *See* Doc. No. 30, FINRA Report Summary for Stratford Partners, *Patrick J. Thomas v. G2 FMV, LLC*, Index No. 152136-2017 (Sup. Ct. New York Cty), attached hereto as Exhibit 39.

[80] *Id.*

in getting the requested materials to you. My plan had been to deliver everything to you in one transmission, but a combination of some things out of my control have not allowed me to focus on completing this task as quickly as I had hoped. Rather than wait any longer, for now, please find the G2 Investment Group financials you had asked for. By way of reminder, G2 FMV, which Integrated Media Resources invested in, owns approximately 84% of the issued and outstanding common equity in G2 Investment Group. Over the next few days, I will endeavor to provide you with financials for G2 FMV, as well as cap tables and a management summary of current projects."[81]

156. On February 28, 2019, Plaintiff again asked for the documents: "Dori, It's been another two weeks and we still haven't received the rest of the requested information. I also have several questions about the 2018 financials vs 2017. As it takes such a long time to receive responses, I would prefer a call with whoever is in charge of the company financials and ask all those questions at that point. When the earliest availability to do such a call? I'm hoping by then we can get the rest of the documents requested (cap table, latest valuation). I am committed to working with you to provide you with the information you have requested."[82]

157. On March 5, 2019, Karjian finally responded: "Attached are current cap tables for G2 Investment Group and G2 FMV, of which Integrated Media Resources is a member. We are continuing to prepare a management report updating shareholders on current assets and projects, which we will share with you as soon as we are able - I anticipate that will be a few more weeks. It would probably be more productive to have a call after you receive that information."[83]

---

[81] *See* Exhibit 29.

[82] *Id.*

[83] *Id.*

158. Plaintiff never received the promised management report of the G2 Companies' assets and projects. Rather, Plaintiff later discovered from an affidavit subsequently filed by Karjian in an unrelated matter the true details and extent of the Insider Defendants' lies and schemes.[84]

159. According to Karjian, G2 IG's paltry assets included only a minority equity interests in Rising, LLC (a real estate investment company) and IX Investments, LLC (an investment company), a contractual right to receive a percentage of net profits from Y2X through December 31, 2024, and an indirect investment in MB Global Partners.[85]

160. Karjian further claimed that G2 IG had not received any revenue as of January 2020 from its minority interests in Rising LLC or IX Investments, LLC or from its contractual right to a percentage of profits from Y2X.

161. Although any revenue from the sale of its indirect interest in MB Global Partners was supposedly meant to be used to "pay the investors and an existing secured loan," Plaintiff has never received any return for their investment.[86]

162. Instead, the Insider Defendants pillaged the G2 Companies for their own personal benefit rather paying its investors. For example, although G2 IG was insolvent in 2017 and its total revenue for the year totaled $2.2 million, the Insider Defendants paid themselves over $3 million in "salaries and benefits," and "professional fees."[87]

163. On May 9, 2019, Plaintiff followed up again: "Dori, I haven't heard from you in weeks. We've completely lost confidence in the company and it's (sic) leadership […]. We tried

---

[84] *See* Exhibit 40

[85] *See* Exhibit 40 at 3.

[86] *Id.*

[87] *See* Exhibit 27 at 2.

to avoid legal action by giving Todd the opportunity to buy us out, which he promised to do over a year ago, but because of the lack of communication, effort, and generally being ignored as valued partners, we are giving Todd one last 30-day notice to buy us out at our original investment amount ($1.5M)."[88]

164. On May 31, 2019, the ending balance of G2 IG's bank account totaled $0.00.[89]

## Q. THE DEMISE OF G2 FMV AND G2 IG

165. As of January 1, 2020, unbeknownst to Plaintiff, G2 IG was no longer an active company and did not have any employees, offices, or consultants under contract.[90]

166. On June 1, 2020, the charters for both G2 IG and G2 FMV were cancelled by the Delaware Secretary of State due to failure to pay taxes.[91, 92]

167. On September 11, 2020, in response to an inquiry from Plaintiff, Karjian wrote: "Please follow up with Todd as I no longer work on G2 matters."[93]

168. Plaintiff has not received any further meaningful communications from Defendants concerning their investment in G2 FMV or the provision of any interest in the G2 Companies purported assets.

169. By virtue of the above acts and omissions, the G2 Defendants and its officers, directors, and legal counsel permitted the transfer, conveyance or other dissipation of the G2 Companies' rights, title, and interest in its assets, and failed, refused or declined to enforce G2

---

[88] *See* Exhibit 29.

[89] *See* Exhibit 30

[90] *See* Exhibit 40 at 3.

[91] *See* Exhibit 31

[92] *See* Exhibit 32

[93] *See* Exhibit 33

FMV's purported claim and representation of ownership to such assets, in exchange for the receipt of absolutely no consideration to the G2 Companies.

170. The Insider Defendants have acquired complete ownership and control of such assets and interests without having provided any consideration to the G2 Companies.

171. The Insider Defendants have received and retained the sole benefit of Plaintiff's $1.5 million investment.

172. In addition, the G2 Companies' officers, directors, and chief legal counsel either: misrepresented the G2 Companies' true position as to its acquisition and ownership of such assets, upon which Plaintiff relied; or failed to meet their duties, as fiduciaries to the investors of insolvent of the insolvent G2 Companies to preserve, protect, and prevent the dissipation of such assets, and allowed them to be fraudulently transferred and conveyed to the Insider Defendants, in return for no consideration to G2 Companies.

## VII.

## PLAINTIFF'S DAMAGES AND LOSS CAUSATION

173. As detailed herein, the Insider Defendants made false and misleading statements and engaged in a scheme to deceive Plaintiff and other investors by falsifying the G2 Companies' financial statements and misrepresenting the use of proceeds of the investors' G2 FMV share purchases. In truth, the G2 Companies did not have the ownership interests it claimed to have, and the proceeds of Plaintiff's share purchase went directly into the Insider Defendants' pockets. After receiving millions of dollars in investment from defrauded investors, the Insider Defendants then began siphoning the G2 Companies' assets. In 2019, when both G2 IG and G2 FMV had been stripped of all value, the Insider Defendants failed to pay taxes, which resulted in the forfeiture of

both G2 IG's and G2 FMV's charters by the Delaware Secretary of State, leaving Plaintiff's shares valueless.

174. As a direct and proximate result of the Insider Defendants' wrongful acts, conduct, statements, and omissions described herein, Plaintiff has incurred the following loss or damages:

- Loss of principal balance invested in G2 FMV;
- Loss of the benefit of the bargain and/or expectancy value, as represented, of the Class A Common Units which have been rendered worthless by the wrongful acts and omissions of the Insider Defendants, as described above;
- Loss of alternate investment opportunities and returns that could have been obtained by each Plaintiff if they had not been fraudulently induced to invest in G2 FMV;
- Legal fees, costs, and expenses; and
- Pre-judgment interest as allowed by law.

175. In addition, as a direct and proximate result of the wrongful conduct described herein, the Insider Defendants have been unjustly enriched by:

- Their wrongful receipt of Plaintiff's funds as described above, and the further economic benefits derived therefrom;
- Their wrongful retention, use, and/or transfer of G2 IG and its assets that was funded by Plaintiff's investment proceeds;
- Their receipt of preferential payments, fraudulent transfers, and other economic benefits from G2 FMV at a time when the company was insolvent, and/or had been rendered insolvent by their acts, conduct, and omissions.

176. The wrongful conduct described herein was attended by circumstances of fraud, malice, willful and wanton behavior, and bad faith.

## VIII.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

177. By this action, Plaintiff seeks direct and derivative relief.

178. The derivative claims are brought to redress injuries suffered by G2 FMV and its subsidiary, G2 IG, as a direct result of the breaches of fiduciary duty, waste, gross mismanagement, as well as aiding and abetting of it, by the Defendants.

179. G2 FMV and G2 IG are named as a nominal party in those claims solely in a derivative capacity.

180. Plaintiff retained an ownership interest in G2 FMV and G2 IG during times relevant to the wrongful conduct alleged here and remain owners of G2 FMV and G2 IG.

181. At all times material to this action, G2 IG has been a subsidiary of G2 FMV.

182. This is not a collusive action brought to confer jurisdiction on this Court that it would not otherwise have. Plaintiff will adequately and fairly represent the interests of G2 FMV and G2 IG and their respective members and shareholders in enforcing and prosecuting their rights.

183. The composition of the board of directors of G2 FMV is identical to the composition of the board of directors of its subsidiary, G2 IG, and board meetings for both companies were held jointly.

184. The Boards of G2 FMV and G2 IG cannot exercise independent, objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons detailed below and elsewhere in this Complaint, Plaintiff should be excused from making a pre-filing demand on the boards to initiate this Action.

185. The Boards of G2 FMV and G2 IG participated in and/or approved many of the acts and omissions, or were on notice of the acts and omissions, which constituted breaches of fiduciary duties owed by the Boards.

186. The Boards of G2 FMV and G2 IG cannot be relied upon to reach a truly independent decision as to whether to consider a demand for action against themselves and the officers responsible for the misconduct alleged in this Complaint because the Boards were dominated by Defendants Morley, de la Rua, Sams and Karjian, and were personally and directly involved in the misconduct alleged and/or who each approved the actions complained of, and to whose directives and views the Boards have consistently acceded and will continue to accede. Defendants Morley, de la Rua, Sams and Karjian engaged in the alleged misconduct in their financial self-interest and to the detriment of G2 FMV and G2 IG and their minority members and shareholders, and their interests are so intertwined with the allegations contained in this Complaint as to render any such demand futile.

187. A demand would be futile and is therefore excused because Defendants Morley, de la Rua, Sams, and Karjian control the boards of G2 GMV and G2 IG and make all major decisions on behalf of those entities.

## IX.

## CLAIMS

### A. Count One: Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Derivatively and Double-Derivatively)

(Against the Insider Defendants)

188. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

189. During the Relevant Period, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications, and a national securities exchange, employing a device, scheme, or artifice to defraud, the Insider Defendants made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the G2 Companies and its stockholders in connection with the Plaintiff's purchase of shares during the Relevant Period, all in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

190. These false and misleading statements, and material omissions, artificially inflated the price of the G2 Companies' common stock.

191. While the price of the G2 Companies' common stock was inflated, certain of the Insider Defendants caused Plaintiff to purchase shares of G2 FMV common stock at prices that were artificially inflated. In July 2014, Plaintiff purchased 22,864 G2 FMV Class A Common Units at artificially high prices.

192. The Insider Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances, under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiff in connection with its purchase of its stock during the Relevant Period.

193. The Insider Defendants, as the most senior officers and/or members of the managing committees of G2 FMV and G2 IG during the Relevant Period, are liable as direct

participants in all of the wrongs complained of herein. Through their positions of control and authority, the Insider Defendants were in a position to and did control all of the false and misleading statements and omissions made on behalf of the G2 Companies, including the contents of all the G2 Companies' Offering Materials. In addition, certain of these false and misleading statements constitute "group published information," which the Insider Defendants were responsible for creating.

194. The Insider Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them and they had express responsibility for knowing such facts. Such material misrepresentations and omissions were made knowingly or recklessly and for the purpose and effect of concealing the G2 Companies' true financial and operating condition from its stockholders and supporting an artificially inflated price of the G2 FMV common stock.

195. As a result of the Insider Defendants' misconduct, Plaintiff has suffered damages in that it paid artificially inflated prices for its common stock. Plaintiff would not have purchased G2 FMV common stock at the prices it paid had Plaintiff been aware that the market price of was artificially and falsely inflated by the Insider Defendants' misleading statements and omissions. As a direct and proximate result of the Insider Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of G2 FMV common stock during the Relevant Period. By reason of such conduct, the Insider Defendants are liable to Plaintiff.

196. Plaintiff have no adequate remedy at law.

### B. Count Two: Breach of Fiduciary Duties (Derivatively and Double-Derivatively)
(Against the Insider Defendants)

197. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

198. As described above, the Insider Defendants, by virtue of their actions, positions, and roles as described above, and as the controlling members/shareholders of G2 FMV and G2 IG, owed a fiduciary duty to the G2 Companies and their members/shareholders.

199. At all times material to this action, the Insider Defendants owed the G2 Companies the fiduciary obligations of loyalty, good faith, and candor, and were required to act in the best interests of all their members/shareholders.

200. As described above, the Insider Defendants failed to meet their fiduciary obligations of loyalty, good faith, and candor and did not act in the best interests of the G2 Companies.

201. The fiduciary duties owed by the Insider Defendants to the G2 Companies included duties of good faith, loyalty, fair dealing, to disclose facts that would affect the companies, the companies' assets, or the companies' investments. Likewise, the Insider Defendants had a fiduciary duty to refrain from conduct that would injure the G2 Companies, especially where they stood to benefit at the companies' expense.

202. As described above, the Insider Defendants breached their fiduciary duties to Plaintiff and the G2 Companies by, inter alia: (1) approving, assisting, carrying out, facilitating, encouraging, and/or failing to prevent the Transactions even though each of the foregoing Defendants had knowledge that (a) the Transactions would cause substantial harm to G2 FMV and G2 IG and (b) the Insider Defendants were self-interested parties in such Transactions; (2) failing to disclose and instead concealing material facts about the Transactions, including the facts that (a) the Transactions would likely cause G2 IG to become insolvent and destroy G2 FMV's

principal asset and (b) the Insider Defendants were self-interested parties in such Transactions; (3) failing to disclose and instead concealing material facts from the members of G2 FMV after the Transactions; (4) directing and overseeing the mismanagement of G2 FMV and G2 IG; and/or (5) putting themselves in a position that was antagonistic to G2 FMV and G2 IG by accepting the role of agent for entities with conflicting interests without disclosing such conflicting interests.

203. As described above, the Insider Defendants engaged in a pattern of willful misconduct and bad faith - misappropriating the assets of the G2 Companies for their own benefit. The Insider Defendants understood that entities under control of the Insider Defendants stood on both sides of the Transactions and that the Transactions amounted to self-dealing. The Insider Defendants benefited from the Transactions to the detriment of the G2 Companies.

204. The Insider Defendants breached their duties of loyalty, care, good faith, and fair dealing by, among other things, intentionally causing the G2 Companies to engage in the transactions described above, which collectively transferred valuable assets worth millions of dollars to Defendants to the detriment of the G2 Companies and caused the G2 Companies to become insolvent. Those Transactions were not made in good faith or the honest belief that the Transactions were in the best interests of the G2 Companies. Indeed, the Transactions were made to benefit the Insider Defendants.

205. In addition, as directors and officers of the G2 Companies, the Insider Defendants had a fiduciary duty to the G2 Companies and its stockholders to operate the business of the Company without violations of law, including the taxing laws to which the G2 Companies are subject.

206. As a limited liabilities companies registered in the State of Delaware, the Insider Defendants knew the G2 Companies were subject to taxation in Delaware.

207. In reckless disregard of their fiduciary duties to the G2 Companies and their members/shareholders. Defendants have exposed the Company to liability and uncertainty as a result of ignoring the corporate franchise taxing requirements of Delaware while continuing to operate the business outside of Delaware.

208. As a direct and proximate result of the breaches of fiduciary duties by the Insider Defendants - which constitute gross negligence, willful misconduct and/or bad faith – the G2 Companies have suffered, and continue to suffer, damages in an amount to be proven at trial, and the Court should award equitable damages and such other relief as the Court may deem appropriate.

## C. Count Three: Waste (Derivatively and Double-Derivatively)
(Against the Insider Defendants)

209. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

210. As set forth above, the Insider Defendants owe fiduciary duties to the G2 Companies to act loyally and in the best interests of their minority members/shareholders. Among other duties, they owe a duty not to waste corporate assets for the benefit of the controlling members and shareholders.

211. As described above, the Insider Defendants failed to meet their fiduciary obligations not to waste corporate assets and did not act in the best interests of the G2 Companies. The Insider Defendants breached their duties to the G2 Companies by using corporate assets to further its purpose of depressing the value and financial abilities of the G2 Companies, which constitutes a waste of corporate assets because such acts were improper and were performed for the benefit of the controlling members rather than to the G2 Companies as a whole.

212. Pursuant to the Transactions described above, the Insider Defendants exchanged valuable liquid assets that belonged to the G2 Companies for consideration so disproportionately one-sided as to create an inference that no person acting in a good faith pursuit of the G2 Companies' interests would have approved the Transactions, which caused the G2 Companies to become insolvent.

213. The conduct of the Insider Defendants was in bad faith, grossly negligent, and self-dealing. It demonstrated (a) a conscious indifference to the consequences to the G2 Companies and (b) such a reckless indifference to and wanton disregard of the rights of their minority members/shareholders so as to be equivalent to an intentional violation of those rights.

214. As a result of the Insider Defendants' breaches of fiduciary duties, the G2 Companies sustained and will continue to sustain injury and damages.

215. The G2 Companies thus are entitled to recovery from the Insider Defendants for damages for the injuries that the Insider Defendants have suffered due to the breach of fiduciary duties.

**D. Count Four: Unjust Enrichment (Derivatively and Double-Derivatively)**
(Against the Insider Defendants)

216. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

217. As set forth above, the Insider Defendants owe fiduciary duties to the G2 Companies to act loyally and in the best interests of their minority members/shareholders. Among other duties, they owe a duty not to unjustly received benefits to the detriment of the G2 Companies.

218. As described above, the Insider Defendants enriched themselves by causing the G2 Companies to act for and transfer funds for the benefit of the Insider Defendants to the detriment

of the G2 Companies. The Insider Defendants received benefits from the Transactions, which were not justly earned because no amount would have been paid had the Insider Defendants chosen not to support, assist, and encourage breaches of fiduciary duties.

219. In addition, even after the G2 Companies became insolvent, the Insider Defendants continued to manage the G2 Companies in an illegal manner that enriched themselves personally, because the Insider Defendants received, either directly or indirectly through entities they controlled, the benefits of the Transactions.

220. Moreover, the Transactions were not the product of a valid exercise of business judgment by the boards of the G2 Companies, because such payments were unlawful and fraudulent, as described above, in light of the G2 Companies' insolvency. Each of Transactions alleged herein was a step in the overall fraudulent scheme to keep the G2 Companies insolvent and judgment-proof, by transferring the G2 Companies' assets into the pockets of the Insider Defendants. A conscious decision to render or keep a corporation insolvent is illegal at common law and under the Delaware General Corporation Law and cannot be the product of a valid exercise of business judgment.

221. Permitting the Insider Defendants to retain any benefits, money and/or property obtained in connection with those Transactions would be contrary to fundamental principles of justice, equity, and good conscience.

222. As a direct and proximate result of the Insider Defendants' wrongful conduct, the G2 Companies have suffered, and continue to suffer, damages in an amount to be proven at trial, and are entitled to an award of equitable damages and such other relief as the Court may deem appropriate.

**E. <u>Count Five: Aiding And Abetting Breaches Of Fiduciary Duties (Derivatively and Double-Derivatively)</u>**
(Against the Insider Defendants)

223. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

224. As set forth above, the Insider Defendants owe fiduciary duties to the G2 Companies to act loyally and in the best interests of the minority members/shareholders.

225. As previously alleged, the Insider Defendants breached their fiduciary duties to the G2 Companies.

226. The Insider Defendants knowingly assisted and participated in these breaches of fiduciary duties.

227. The Insider Defendants acted in concert with the Insider Defendants to act in their interests and marginalize the interests of the G2 Companies and the minority members/shareholders in connection with the Transactions.

228. As a direct and proximate result of the concerted actions of the Insider Defendants in the Transactions, the G2 Companies have suffered, and continue to suffer, damages in an amount to be proven at trial, and are entitled to an award of equitable damages and such other relief as the Court may deem appropriate.

229. The Insider Defendants conduct was in bad faith, grossly negligent, and self-dealing. It demonstrated (a) a conscious indifference to the consequences to the G2 Companies and (b) such a reckless indifference to and wanton disregard of the rights of minority members/shareholders so as to be equivalent to an intentional violation of those rights.

230. As a direct and proximate result of the Insider Defendants' wrongful conduct, the G2 Companies have suffered, and continue to suffer, damages in an amount to be proven at trial,

and are entitled to an award of equitable damages and such other relief as the Court may deem appropriate.

**F. <u>Count Six: Declaratory/Injunctive Relief (Derivatively and Double-Derivatively)</u>**
(Against the Insider Defendants)

231. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

232. An actual controversy has arisen and now exists between Plaintiff, on the one hand, and the Insider Defendants, on the other hand.

233. The controversies concern at least the following:

- The Insider Defendants' ability to serve in any executory or supervisory role or function on behalf of the G2 Companies given their breaches of fiduciary duty; and
- who should run the G2 Defendants on an interim or permanent basis,

234. Plaintiff is entitled to a judicial declaration and injunctive relief in the form of an order providing that:

- The Insider Defendants be removed as directors and officers of the G2 Companies;
- Plaintiff be given unfettered access to books and records of the G2 Companies to assess the status of the corporate activities, where the funds have gone and any inter-company transactions;
- a meeting of stockholders must be held, under the supervision of a special master appointed pursuant to *8 Del. C. §§ 211(c)* (permitting the Court of Chancery to order a stockholder meeting); 225 (permitting the Court of Chancery to determine the validity of any election, appointment, removal or resignation of any director or office of the corporation); and 227 (permitting Court of Chancery to determine rights and powers of stockholders and appoint a Master to hold an election under Sections 211, 215 or 225)

for the purpose of, inter alia, to determine the rights and powers of persons or entities claiming to own shares of the G2 Companies;

- any individual or entity purporting to have an ownership interest in the G2 Companies shall be enjoined from entering any and all transactions on behalf of the G2 Companies until this pending litigation is resolved;
- appointment of a custodian for the benefit of the G2 Companies' stockholders, to recover all improper payments and other transfers and to prevent the Insider Defendants' further (1) gross mismanagement; (2) irreparable harm to the G2 Companies' business; (3) fraudulent accounting practices; and (4) other wrongful acts;
- a finding that G2 Companies are alter egos of Morley; and
- a determination of which entity or individual has an ownership interest in G2 FMV and the amount of such ownership interest.

235. With respect to the request for an appointment of a custodian, the facts alleged above satisfy the standard set by Delaware Courts for the appointment of a custodian. "Without relying upon any statutory basis, a party can state a claim for appointment of a custodian or receiver upon a showing of fraud, gross mismanagement, positive misconduct by corporate officers, breach of trust, or extreme circumstances showing imminent danger of great loss which cannot otherwise be prevented." *Zutrau v. Jansing*, 2013 Del. Ch. LEXIS 71, 2013 WL 1092817, fn. 25 (Del. Ch. Mar. 18, 2013); *Vale v. Atl. Coast & Inland Corp.,* 99 A.2d 396, 400 (Del. Ch. 1953).

**G. Count Seven: Equitable Constructive Trust (Derivatively and Double-Derivatively)**
(Against the Insider Defendants)

236. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

237. The G2 Companies are entitled to one or both of two forms of constructive trusts.

a. Company Constructive Trust: Plaintiff seeks, on behalf of the G2 Companies, a constructive trust with respect to all of the G2 Companies' property, assets, and interests to ensure that Morley and others are prevented from further wasting corporate assets, diverting the G2 Companies' funds to unrelated business ventures, or otherwise engaging in gross mismanagement of the G2 Companies.

b. Majority Stockholder Constructive Trust: Plaintiff separately seeks, on behalf of the G2 Companies, a constructive trust over the property, assets and interests of Morley, who has been unjustly enriched at the expense of Plaintiff and the G2 Companies. Morley controls the G2 Companies to the detriment of the G2 Companies' shareholders. He has used his various positions and the entities that he controls to loot the assets of the G2 Companies. To permit these Defendants to reap the benefits of Morley's inequitable behavior would be unfair and unjust.

## H. <u>Count Eight: Equitable Accounting (Derivatively and Double-Derivatively)</u>

(Against the Insider Defendants)

238. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

239. Morley owes fiduciary duties to Plaintiff.

240. Morley has engaged in a pattern and practice of disregarding the contractual and fiduciary obligations to Plaintiff as identified more specifically identified above, which allegations are incorporated by reference herein. Additionally, other circumstances identified in this Complaint render an accounting just and reasonable.

241. Morley has breached his fiduciary duties of loyalty owed to Plaintiff by directing corporate funds to his benefit, and he personally profited from the improper use of corporate property.

242. This Count seeks an equitable accounting from Morley (or anyone else the Court may direct) of all the G2 Companies' assets and other such property or rights adjudged to be G2 Company assets and a rendering of a judgment for the amount ascertained to be due to the G2 Companies.

243. There exists a sufficient relationship between Plaintiff and Morley to support the imposition upon Morley of a duty in equity to account to the G2 Companies.

244. Proper relief cannot be accorded amongst the parties without an equitable accounting for the funds misappropriated by Morley.

**I. Count Nine: Fraudulent Misrepresentation (Direct)**
(Against Defendants Morley and Karjian)

245. Plaintiff IMR repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

246. Defendants Morley and Karjian made multiple fraudulent misrepresentations to Plaintiff as set forth herein. As alleged in detail above, the fraudulent misrepresentations include at least the following:

- misrepresentations as to the use of the funds Plaintiff would invest in G2 FMV, including that the funds would all be used for purposes of advancing the Plaintiff's investment;
- misrepresentations as to G2 IG's assets, including statements related to MB Global, Grafton Asset Management/Grafton Energy Capital and Rising;
- misrepresentations that they would receive economic benefit from the MB Global and Grafton partnership-related businesses; and
- misrepresentations as to the G2 Companies' cash flow problems.

247. The foregoing misrepresentations were in fact false as detailed above.

248. When Morley and Karjian made the foregoing misrepresentations to Plaintiff, they knew them to be false, and made the misrepresentations with the intent to deceive and defraud Plaintiff, and to induce Plaintiff to act in reliance on these misrepresentations in the manner hereafter alleged, or with the expectation that Plaintiff would so act.

249. Plaintiff, at the time Morley and Karjian made the foregoing misrepresentations, and at the time Plaintiff took action on the misrepresentations, was unaware of the falsity of the misrepresentations and believed them to be true. In reliance on these misrepresentations, Plaintiff was induced to and did invest $1.5 million in G2 FMV. Had Plaintiff known the actual facts, Plaintiff would not have invested in G2 FMV. Plaintiff's reliance on Morley and Karjian's misrepresentations were justified.

250. As a proximate result of the fraudulent conduct of Morley and Karjian as herein alleged, Plaintiff was damaged.

### J. **<u>Count Ten: Civil Conspiracy (Direct)</u>**

(Against Morley, Karjian, Sams, Lerman, de la Rua, and Boyazny)

251. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

252. On information and belief, Defendants, and each of them, knowingly and willfully conspired and agreed among themselves to defraud Plaintiff, to breach or aid and abet in the breach of the fiduciary duties of Defendants Morley, de la Rua, and Karjian and to commit other torts as alleged herein. This was done in a coordinated effort between the Defendants Morley, Karjian, Sams, Lerman, de la Rua, and Boyazny.

253. Defendants Morley, Karjian, Sams, Lerman, de la Rua, and Boyazny, and each of them, furthered the conspiracy by cooperation or lent aid and encouragement to or ratified and adopted the acts of the each other.

254. Defendant Morley, Karjian, Sams, Lerman, de la Rua, and Boyazny's wrongful actions as alleged herein have resulted in actual damage to Plaintiff, as also alleged herein.

## X.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that Defendants be cited to appear and answer and, on final hearing, that a judgment be awarded against Defendants awarding:

a. Actual, compensatory and consequential damages to G2 FMV and G2 IG on Plaintiff's derivative claims;

b. Actual, compensatory, and consequential damages to Plaintiff on their direct claims;

c. Restitution;

d. Ordering Defendants to disgorge all profits obtained as a result of their wrongful conduct;

e. Declaring that the Insider Defendants have breached fiduciary duties, wasted corporate assets, and been unjustly enriched;

f. Imposing a constructive trust on all assets of the G2 Companies until such time as an accounting can be completed and any judgment or order entered in this action can be satisfied;

g. Imposing a constructive trust on behalf of the G2 Companies, over the property, assets and interests of Morley, which have been unjustly enriched at the expense of Plaintiff;

h. Appointing a temporary custodian of the G2 Companies;

i. Appointing a custodian for the benefit of the G2 Companies stockholders, to recover all of the payments and other transfers improperly made to date and to prevent Defendants' further: (1) gross mismanagement; (2) irreparable harm to the G2 Companies' business; (3) fraudulent accounting practices; and (4) other wrongful acts;

j. Pre-and post-judgment interest at the maximum amount allowed by law;

k. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

l. Granting such other and further relief as the Court deems just and proper.

Dated: June 5, 2021

Respectfully submitted,

By: /s/ William A. Brewer III

William A. Brewer III
William A. Brewer IV
BREWER, ATTORNEYS & COUNSELORS
750 Lexington Avenue, 14th Floor
New York, New York 10022
Telephone: (212) 489-1400
Facsimile: (212) 751-2849

**ATTORNEYS FOR INTEGRATED MEDIA RESOURCES**